* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Deluca and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff and defendant-employer at the times in question.
3. The carrier on the risk is Key Risk Insurance Company.
4. Plaintiff's average weekly wage is $391.99 per week.
5. Stipulated documents include the Pre-trial Agreement, medical records, Industrial Commission forms, and discovery responses.
6. The issues before the Full Commission are whether plaintiff's carpal tunnel syndrome is compensable either as a result of the compensable injury of September 16, 2003 or as an occupational disease, and whether plaintiff sustained injuries to her right shoulder and neck on September 16, 2003.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on September 28, 1972. Other than her work with defendant-employer, plaintiff has been employed in retail sales and as a receptionist. Plaintiff first worked with defendant-employer beginning in 1992, but took some time off to stay home with her children, returning to the school system in 2002.
2. As of September 2003, plaintiff was working both as a bus driver and as a custodian. As a custodian, plaintiff performed floor care for three and a half to four hours per day. She vacuumed and buffed floors, in addition to sweeping, mopping and scrubbing. The buffing machine plaintiff used was a high-speed, propane-powered buffer that moved only in a forward line. The buffing machine did not involve maneuvering with the hands but did require plaintiff to use strength in her shoulders. The brooms plaintiff used were straight-ahead push brooms with swivel heads, which allowed them to go easily under desks. Plaintiff used a commercial mop that weighed six to eight pounds wet and plaintiff also used a "scrubber," which is similar to an automated mop. Plaintiff also used vacuum cleaners. Mitch Foust, head custodian, did most of the buffing and testified that plaintiff buffed approximately one to two hours per week. Plaintiff also performed bathroom work for about one and a half hours per day, which included cleaning toilets, sinks, stalls and mirrors. Outside of her employment with defendant-employer, plaintiff also cleaned and painted apartments owned by her parents.
3. As of September 2003, plaintiff was paid for six hours of work per day, although she often worked additional hours as a volunteer, performing custodial duties. Plaintiff was not paid for the additional hours she worked, although she was given more vacation time. Others, including plaintiff's husband and children, and Mr. Foust's wife and children, also performed volunteer work. Patricia Pennington, principal at plaintiff's school, told plaintiff that she should do less volunteer work.
4. Plaintiff's wrist symptoms began in June 2003 while she was working as a daycare assistant for the school system during the summer months. As a daycare assistant, plaintiff looked after children for approximately six hours per day and cleaned up for 45 minutes to an hour each day. Clean up involved cleaning the entire daycare, including the bathroom outside the classroom. The bathroom consisted of three urinals and three stalls.
5. For approximately four weeks in August and September 2003, Mr. Foust was out of work on medical leave. During this time, plaintiff had somewhat longer hours and did more buffing than normal. Mr. Foust cleaned the floors before his medical leave and plaintiff maintained them while he was out of work.
6. On September 16, 2003, plaintiff and Mr. Foust moved a desk. Plaintiff described the desk as large and very heavy, and estimated that it weighed 150 pounds. Mr. Foust unpacked new desks delivered to the school, was familiar with their weight, and estimated that the desk weighed 55 pounds. Mr. Foust stated that the desk was not heavy, although it was awkward to move. However, the desk plaintiff and Mr. Foust moved was not a new desk, but was an old metal desk with a wood top. The Commission finds that the desk weighed approximately 150 pounds.
7. As plaintiff and Mr. Foust moved the desk, plaintiff dropped it three times due to its weight and the desk fell straight to the ground. Plaintiff stated that she went down with the desk sideways, in a twisting motion and experienced an immediate pain in her low back, neck and right shoulder. Plaintiff and Mr. Foust left the desk where it was and plaintiff went inside to put a can of cold soda on her neck. Ms. Pennington came by the break room and plaintiff told her that she and Mr. Foust had dropped the desk and that she was injured.
8. Defendants filed a Form 63 and accepted as compensable plaintiff's low back injury sustained as a result of the desk moving incident on September 16, 2003. Defendants paid compensation to plaintiff at a rate of $391.99 per week from September 17, 2003 and continuing. Subsequently, defendants denied plaintiff's claim for bilateral carpal tunnel syndrome and denied that plaintiff sustained a cervical injury as the result of the September 17, 2003 incident.
9. On September 18, 2003, plaintiff was treated at Caldwell Memorial Hospital Emergency Room. Her family doctor, Dr. William Smith, ordered a thoracic and lumbar MRI on October 2, 2003. Shortly thereafter, plaintiff was sent to Dr. John L. dePerczel, a board certified orthopedic surgeon, whom defendants approved as plaintiff's treating physician. On November 17, 2003, Dr. dePerzcel ordered a cervical MRI, which revealed a herniated C5-6 disc. Dr. dePerczel determined that plaintiff also had bilateral carpal tunnel syndrome, which was confirmed by a January 23, 2004 nerve conduction study. At his deposition, Dr. dePerczel stated that plaintiff's job duties substantially aggravated her pre-existing bilateral carpal tunnel syndrome and that the occupation placed her at an increased risk of developing symptomatic carpal tunnel syndrome. Dr. dePerczel also causally related plaintiff's neck strain to the injury at work, but he did not recommend surgery for the cervical condition. He declined to offer an opinion as to whether the incident of September 16, 2003, caused the bulging disks in plaintiff's neck or the tendonitis in her shoulder.
10. In March 2004, plaintiff saw Dr. Scott McCloskey, a board certified neurosurgeon. Approximately 15 to 20 percent of Dr. McCloskey's practice is devoted to hand problems and 65 to 70 percent is devoted to spine problems. Dr. McCloskey testified that all of plaintiff's diagnoses could be caused or aggravated by trauma, such as a heavy-lifting injury. Dr. McCloskey explained that the lifting injury substantially caused plaintiff's cervical disk herniation, possible rotator cuff tear on the right, lumbar strain, and that it substantially aggravated her carpal tunnel syndrome, which plaintiff probably had before the lifting incident. Dr. McCloskey stated, however, that if the desk weighed 48 to 50 pounds, that factor would affect his causation opinion. Dr. McCloskey also testified that plaintiff's job put her at a higher risk of developing carpal tunnel syndrome and ulnar nerve entrapment, and may have set her up for a rotator cuff tear. Dr. McCloskey felt that plaintiff needed an MRI to rule out a torn rotator cuff. He recommended first proceeding with the carpal tunnel surgery, since carpal tunnel syndrome surgery is less complicated than a cervical spine fusion and the conditions sometimes have overlapping symptoms. Dr. McCloskey believed that plaintiff should not return to work until her medical problems were resolved. He stated that plaintiff "seemed symptomatic enough that they [her problems] needed to be addressed before she got back into the workforce."
11. On August 6, 2004, plaintiff saw Dr. Jeffrey Knapp, a board certified orthopedic surgeon, for a second opinion. Plaintiff complained of neck pain, right arm pain greater than left, shoulder pain, hand numbness, and had findings consistent with cervical radiculopathy and carpal tunnel syndrome. Dr. Knapp stated that plaintiff's neck condition was probably causally related to the incident on September 16, 2003 and that plaintiff needed a diskectomy and cervical fusion as a result of the lifting incident. Dr. Knapp believed that plaintiff's shoulder complaints were related to the cervical disc injury. Further, Dr. Knapp did not believe that the carpal tunnel syndrome was causally related to the lifting incident. He stated that plaintiff's job predisposed her to having an increased risk of developing carpal tunnel syndrome as compared to members of the general population. Dr. Knapp testified that the repetitive nature of plaintiff's job caused her carpal tunnel syndrome.
12. Bill McClure, ergonomist, performed an on-site evaluation of plaintiff's job and obtained data regarding her job duties, which he then used to perform a risk assessment utilizing the "Washington checklist." Based upon his assessment, Mr. McClure found that there were no risk factors in plaintiff's job as a custodian that predisposed her to developing carpal tunnel syndrome or other cumulative trauma disorders of the upper extremities. At his deposition, Mr. McClure testified that he did not realize that plaintiff's duties included operating a buffer or cleaning toilets, however, he did not believe that these additional responsibilities altered his conclusions.
13. The Commission gives greater weight to the expert opinions of Drs. DePerczel, McCloskey and Knapp than to Mr. McClure regarding the nature of plaintiff's job duties and the causation and increased risk of plaintiff developing carpal tunnel syndrome. Based on the greater weight of the evidence, the Commission finds that plaintiff's job as a custodian placed her at an increased risk of contracting carpal tunnel syndrome and was a significant causal factor in her development of carpal tunnel syndrome. The Commission also finds that plaintiff's compensable injury by accident on September 16, 2003, was a significant causal factor in her cervical disc herniation and related symptoms, but that her shoulder injury was not causally related to the injury by accident. Plaintiff has not reached maximum medical improvement of her carpal tunnel syndrome or her neck injury.
14. Defendants contacted plaintiff to return to the custodian job with modifications. However, both Dr. dePerczel and Dr. McCloskey have not approved such work for plaintiff. On February 12, 2004, Dr. dePerczel set work restrictions of pushing and pulling up to 30 pounds, lifting up to 30 pounds, working 4 hours per day, resting 10 minutes per hour, and getting up and down at will. Dr. dePerczel noted that he did not feel plaintiff currently could perform repetitive work, and that from that perspective, she was totally disabled. Drs. McCloskey and Knapp believed, and the Commission finds, that plaintiff is disabled from any employment as the result of her compensable injury by accident and occupational disease.
15. At the Deputy Commissioner's hearing, plaintiff requested that her fusion surgery, should it be necessary, be performed by Dr. McCloskey rather than Dr. Knapp. She testified that she was uncomfortable with Dr. Knapp because he was selected by Connie Henline, the rehabilitation counselor, that Dr. Knapp was not talkative with her, and that Dr. McCloskey's office was closer to her home.
16. After the Deputy Commissioner's hearing, plaintiff began treatment with Dr. Hans Hansen at Pain Relief Centers. Plaintiff filed a motion for a change of physician for pain management. Defendants opposed this motion. The Commission finds that the change of physician should be approved because of the deterioration of the physician/patient relationship between Dr. Hansen and plaintiff. Additionally, plaintiff filed a motion seeking removal of Greg Henderson, the vocational counselor assigned to plaintiff, but the Commission does not find any grounds to support this removal.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On September 16, 2003, plaintiff suffered a compensable injury by accident in which she sustained injuries to her neck and low back. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's shoulder condition is not causally related to her compensable injury by accident on September 16, 2003. N.C. Gen. Stat. § 97-2(6); Click v. Freight Carriers, 300 N.C. 164,265 S.E.2d 389 (1980).
3. Compensation under the Workers' Compensation Act may be awarded for an occupational disease pursuant to N.C. Gen. Stat. §97-53(13) if two conditions are met: (1) the disease must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment"; and (2) the disease cannot be an "ordinary disease of life to which the general public is equally exposed outside of the employment."Booker v. Medical Center,297 N.C. 458, 468; 256 S.E. 2d 189, 196 (1979). The claimant bears the burden of proving the existence of an occupational disease. Gayv. J.P. Stevens Co., 79 N.C. App. 324, 331, 339 S.E. 2d 490,494 (1986).
4. In this case, plaintiff's employment with defendant-employer caused or significantly contributed to the development of carpal tunnel syndrome and plaintiff's job with defendant-employer placed her at an increased risk for developing this condition. Plaintiff's carpal tunnel syndrome was not an ordinary disease of life to which the general public is equally exposed and, therefore, plaintiff contracted a compensable occupational disease. N.C. Gen. Stat. § 97-53(13); Booker v. Medical Center,supra.
5. As a result of her compensable injury by accident and occupational disease, plaintiff continues to be totally disabled from any employment and is entitled to receive temporary total disability compensation at the rate of $261.33 per week until plaintiff returns to work or until further Order of the Commission. N.C. Gen. Stat. § 97-29.
6. Plaintiff is entitled to the payment of medical expenses incurred or to be incurred as a result of her compensable injuries and compensable occupational disease as may reasonably be required to effect a cure, provide relief, or lessen her period of disability. N.C. Gen. Stat. § 97-25.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall continue to pay plaintiff temporary total disability benefits in the amount of $261.33 per week until plaintiff returns to work or until further Order of the Commission.
2. A reasonable attorney fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be deducted from the compensation due plaintiff and paid directly to plaintiff's counsel.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of the compensable injury and occupational disease, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, or give relief or may tend to lessen plaintiff's period of disability. This shall also include treatment for plaintiff's neck, low back, and bilateral carpal tunnel syndrome. Dr. McCloskey is approved as plaintiff's treating physician for fusion surgery, should it be necessary.
3. Plaintiff's motion for a change in pain management physician is granted.
4. Plaintiff's motion for removal of Mr. Henderson as vocational counselor is denied.
5. Defendants shall pay the costs. The costs shall include an expert witness fee of $425.00 to Dr. Knapp, $700.00 to Dr. dePerczel, $425.00 to Dr. McCloskey, and $377.50 to Mr. McClure, if not already paid.
This 21 day of April 2006.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER